# Maxwell *v*. The State.

## *Indictment for Murder.*

1. *Amending and reviving laws, under constitutional provisions; effect of repealing clause re-enacted in amendatory law.*—The general jury law of February 28th, 1887, (Code pp. 132-5, note), excepted from its operation several counties named, among which were Clay and Marengo, but Jefferson county was not excepted. At the next session of the General Assembly, on the 11th February, 1887, a special act was approved, "to expedite the trial of capital cases in Jefferson" (Sess. Acts 1888-9, p. 324), which specified the number of peremptory challenges in such cases, and contained other provisions inconsistent with said general jury law. On February 28th, 1889, a subsequent day of the same session, another statute was enacted, entitled "An act to amend sections 3, 6, 13 and 17 of" said general jury law (*Ib.* 77), one of the amendments specifying the number of peremptory challenges in criminal cases, and another striking out the names of Clay and Marengo from among the excepted counties; but, in the section making this last amendment, the 17th section of the original act, as thereby changed, was set out in full, containing a clause repealing "all laws and parts of laws, general and special, conflicting with the provisions of this act." *Held*, that the repealing clause, thus re-enacted, did not affect any of the provisions of said local law which were not in conflict with the amendatory law, though they were in conflict with the original law, but did repeal the 8th section thereof, specifying the number of peremptory challenges, because it was inconsistent with said amendatory law; and in declaring the repeal of this section, the court is governed by the words of said repealing clause, contrary to their conviction as to the legislative intent.

2. *Peremptory challenges in capital case, in Jefferson county.*—Under general and local statutory provisions, as construed in this case (Sess. Acts 1888-9, pp. 77-9, § 2; pp. 324-6, § 8), a defendant on trial for a capital offense, in Jefferson county, is entitled to twenty-one peremptory challenges, the number prescribed by the general law, and is not limited to ten, the number prescribed by the local law of prior date.

3. *Order setting day for trial; presence of defendant in court*—The defendant being present in court when an order is made setting a day during the next ensuing term for his trial, and making no objection thereto; and on the day so appointed, he being personally present, an order is made, without objection on his part, that the case be *passed* until a future named day of the term; the cause stands regularly for trial on that day, and there is nothing in the proceedings of which the defendant can complain.

4. *Drawing special jurors, under local law.*—Under the provisions of the local law governing the trial of capital cases in Jefferson county (Sess. Acts 1888-9, pp. 324-6), the presiding judge is required to draw from the jury-box the names of not less than fifteen nor more than

[Maxwell v. The State.]

twenty-five persons as special jurors, from whom he shall organize a third jury, which, with the regular juries for the week, shall constitute the *venire* for the trial of any capital case during the week; and it is expressly declared (§ 7), that the presence of the defendant in court shall not be necessary, either at the drawing or organizing of said trial jury to complete the *venire;* nor can his absence prejudice him, since he can assert all of his constitutional rights when his case comes on for trial.

5. *Discharge of juror on special venire, before trial* --In organizing the third jury under said local law, from the special jurors drawn and summoned, the court may, for good cause shown, discharge one or more of them, though the defendant is not in court at the time; and such action is not a reversible error, though excepted to on the trial.

6. *Objection to question and answer.*—Objection being made and over-ruled to a question calling for illegal evidence, and exception duly reserved; and, the answer to the next question being legal, motion is made to "exclude said *answers* from the jury, as illegal and irrelevant," which motion is overruled on the statement of the opposite attorney that he would connect it with other evidence which would render it competent; the benefit of the first exception is not lost because the sub-sequent motion embraced evidence partly legal, nor because the motion or objection was not renewed after the failure to adduce the necessary connecting proof.

7. *Error without injury in admission of illegal evidence.*—The doctrine of error without injury, in the admission of illegal evidence against objection, is applied with greater strictness in criminal than civil cases; if, indeed, the decisions have not established the rule, that it will never be applied except where it affirmatively appears that the defendant was benefitted by the ruling of which he complains.

8. *Insanity as defense; burden and measure of proof.*—When insanity is interposed as a defense in a criminal case, the burden of proving it, at least by a preponderance of the evidence, rests on the defendant, and a reasonable doubt of its existence does not require a verdict in his favor.

9. *Plea of insanity, with not guilty; form of verdict; charges to jury.* Under statutory provisions regulating the defense of insanity in criminal cases (Sess. Acts 1888-9, pp. 742-6), that defense is required to be interposed by special plea, and, if sustained, the form of the verdict is prescribed—"not guilty by reason of insanity"; and when the general issue is also pleaded, and the two issues are submitted and tried at the same time, charges based on the defense of insanity, but claiming a verdict of "not guilty," are properly refused, because misleading.

FROM the Criminal Court of Jefferson.

Tried before the Hon. S. E. GREENE.

The defendant in this case, John T. Maxwell, was indicted for the murder of John B. Rickles, by shooting him with a gun or pistol; pleaded not guilty, and a special plea of "not guilty by reason of insanity"; was convicted of murder in the first degree, and sentenced to the penitentiary for life. The indictment was found on the 8th October, 1887. The cause was continued from term to term, until October 5th, 1889, when, as the minute-entry recites, "the defendant being present in person and by attorney," it was ordered that the cause "be continued until the next term of this court, and Friday, the 25th day of October, 1889, is hereby set for

the trial of said case. On the 25th October, 1889, as the minute-entry of that date recites, the defendant being present "in person and by attorney," it was ordered that the cause "be, and the same is hereby, passed until Monday, December 2d, 1889." When the cause was called for trial, "at 2 o'clock P. M. on said 2d December, 1889, the defendant objected to going to trial on this day," as the bill of exceptions recites; which objection the court overruled, and the trial proceeded, the defendant excepting.

On the 26th November, 1889, a minute-entry was entered, in these words: "It appearing to the court that there are several capital cases set for trial in this court during the week beginning on Monday, December 2d, 1889, the judge of this court proceeds to draw publicly from the jury-box, as by law provided, said box having been first well shaken, the names of twenty-five persons to complete the *venire* for the trial of capital cases during said week; whereupon, a list was immediately made by the clerk of the court, of the said names, and an order issued to the sheriff of said county to summon the persons so drawn, to appear and serve as petit jurors in this court, on Monday, December 2d, 1889," setting out the order. "It is further ordered by the court, that the sheriff of said county shall serve upon each of the defendants now confined in jail, charged with a capital offense as aforesaid, and whose case is set for trial during said week, a copy of the indictment against him, together with a list of the names so drawn from the jury-box, as provided by law, to complete the *venire* for the trial of each of said capital cases, and a list of the regular jurors as drawn by the commissioners to serve as petit jurors for the said 9th week of the present term of this court, at least one entire day before the day set for the trial of each of said causes."

On the 2d December, the day set for the trial, the minute-entry sets out the sheriff's return showing his summons of nineteen out of the twenty-five persons drawn as special jurors, the other six not being found, and that he had served on the defendant, on the 26th November, a list of said twenty-five persons, with a list of the persons composing the regular juries for the week, as drawn by the jury commissioners, and a copy of the indictment. The minute-entry then recites the appearance of the nineteen persons so summoned; that two of them were excused by the court, "upon good and sufficient cause being shown," and that the court then proceeded to organize a third jury from the remainder; and

[Maxwell v. The State.]

some of the regular jurors for the week not appearing, and their places being supplied by the summons of others, and one of them being excused from service, because he had served as a regular juror within the preceding six months, the court proceeded to organize two regular juries for the week out of those remaining, who, with said jury, should constitute the special venire for the trial of capital cases during the week.

The bill of exceptions states that the proceedings had on the 26th November, shown by said minute-entry of that date, "were made, had and done in the absence of the defendant, without notice to him or his counsel, and without his knowledge or consent;" and that the proceedings had on the 2d December, as shown by the minute-entry of that date, "were made, had and done on the morning of that day, before the defendant's case was reached, or in any way called for trial, in the absence of defendant and his counsel, and without their knowledge or consent;" and it is further stated that the proceedings had on that day, "in the organization and impanelling of said juries, were not known to defendant or his counsel until after the verdict was rendered in said cause." These errors and irregularities, as alleged, were made the grounds of a motion for a new trial, and also of a motion in arrest of judgment, each of which was overruled.

"On the trial, the State introduced witnesses whose testimony tended to show that the defendant, unlawfully and with malice aforethought, killed John Rickles by shooting him with a gun, on the morning of June 22d, 1887, at the village of Irondale in said county, near which place the deceased resided;" but the particulars of the shooting are not stated. The defendant introduced several witnesses who testified, in substance, that his wife and children resided in a secluded place on the mountain side, about ten miles from Birmingham, and sixteen miles from Irondale, having no neighbors nearer than a half-mile, while he was employed in Birmingham, and only went home on Saturday evening; that on the morning of June 11th, 1887, the deceased, "who said he was in the employment of the Sloss Steel and Iron Company, and was looking after mineral lands," was seen in the neighborhood of defendant's residence, inquired the way to the house, and also made inquiries about the defendant's absence and the time of his probable return; and his little daughter, about nine years old, testified that a man,

whose appearance, as described by her, corresponded with that of the deceased, came to the house about noon on that day, inquired about some "land numbers," and, after looking at some papers shown him by Mrs. Maxwell, said something to her in a low tone of voice, and attempted to throw his arms around her, but she seized a pistol, and drove him away.    This was all the testimony in reference to the alleged assault.

"On cross-examination of one of the defendant's witnesses, the prosecution asked him if a certain negro, naming him, had not lived on a part of the forty acres constituting the homestead of defendant and his wife, and set up claims to the same; to which question defendant objected, on the grounds of irrelevancy and illegality;" which objection the court overruled, and the defendant excepted.    "The witness replied, that such a negro did live on said land, but he had never heard that he made any claim to it.    The witness said, in answer to a question, that the land was mineral land. The defendant then moved the court to exclude said answers from the jury, on the ground that the same was illegal and irrelevant testimony; which motion the court overruled, on the statement of the solicitor that he would connect with other evidence that would render it competent; to which ruling the defendant then and there excepted."

The defendant introduced several witnesses who testified to his singular conduct several weeks before the killing, indicating aberration of mind, afterwards aggravated by the alleged assault on his wife; and his family physician testified that, in his opinion, the defendant was insane at the time of the killing.    The defendant testified in his own behalf, and said that from the time his wife told him of the assault on her, when he reached home Saturday night, "up to the time of the killing, he remembered nothing, except that he was wandering in every direction, trying to find the man who had attempted to outrage his wife."

The defendant requested the following charges in writing, and duly excepted to the refusal of each:

(1.) "If the jury believe from the evidence that the defendant, at the time when the fatal shots were alleged to have been fired, was so far affected in his mind and memory that he was not able to distinguish right and wrong, and had not knowledge and understanding of the character and consequences of his acts, and power of will to abstain from

[Maxwell v. The State.]

it; then he was not a legally responsible being, and the jury should find him not guilty."

(2.) "In order to sustain the defense of insanity, it is not necessary that the insanity of the accused be established by a preponderance of evidence; if, on the whole evidence, the jury entertain a reasonable doubt as to the sanity of the accused, they must acquit him."

(3.) "While the law presumes every man to be sane, and responsible for his acts, until the contrary appears from the evidence; still, if there is evidence in the case tending to rebut this presumption, sufficient to raise a reasonable doubt upon the issue of sanity, then the burden of proof is on the State to show by the evidence, beyond a reasonable doubt, that the defendant was sane at the time the alleged offense was committed."

(4.) "To warrant a conviction in this case, it is incumbent on the State to establish by evidence to the satisfaction of the jury, beyond a reasonable doubt, the existence of every element necessary to constitute the crime charged; and if the jury, after a careful and impartial examination of all the evidence in the cause bearing on the question of sanity or insanity, entertain any reasonable doubt of the defendant's sanity at the time of the alleged offense, they should give him the benefit of that doubt, and acquit him."

(5.) "Before the jury can convict the defendant in this case, they must be satisfied beyond a reasonable doubt, and to a moral certainty, that he committed the act, and that he has not established his plea of insanity by a preponderance of the evidence."

(6.) "A probability that the defendant was insane at the time of firing said shots, or was unable to distinguish between right and wrong as to the act he was committing, or had not the will power to control him, then the jury must find him not guilty."

(7.) "A probability of the defendant's innocence is a just ground for a reasonable doubt, and therefore for his acquittal."

W. J. CAHALAN, C. G. BROWN, and THOS. H. WATTS, for appellant.

WM. L. MARTIN, Attorney-General, for the State.

McCLELLAN, J.—The act of February 28, 1887, "to more effectually secure competent and well qualified jurors

in the several counties in this State," undertook to establish a general jury system throughout the State, and was made to apply to all the counties of the State, with a proviso excepting from its operation certain named counties, among which were Clay and Marengo. Jefferson was not one of the excepted counties. The seventeenth section of the act is in the following language: *"Be it further enacted,* That section 4732 of the Code of Alabama, and all other laws and parts of laws, general and special, conflicting with the provisions of this act, be, and the same are hereby, repealed; but all laws now in force in relation to jurors, their drawing, selecting or qualification, not in conflict with this act, are hereby continued in full force and effect. But the provisions of this act shall not apply to the counties of Henry, Mobile, Dallas, Talladega, Clay, Marengo, Cherokee, Etowah, St. Clair, Coffee, Dale, Geneva, Marshall and Montgomery."

The legislature, at its next session, passed an act "to expedite the trial of capital cases in Jefferson county," which was approved February 11, 1889. This act provided for the drawing, summoning and impanelling special jurors for the trial of capital cases, differing in several respects from the mode prescribed in the general law referred to, prescribed the number of peremptory challenges to be allowed the State and defendant respectively, and repealed "all laws, general and special, in conflict with" its provisions, and expressly continued in full force and effect all laws, general and special, not in conflict.—Acts 1888-9, p. 324. The effect of this statute was, of course, to repeal all the provisions of the act of 1887, which were in conflict with it, so far as Jefferson county was affected thereby.

At the same session (1888-9) of the General Assembly, it was considered that the act of 1887 was defective, and needed amendment in its third, sixth, thirteenth and seventeenth sections; and on February 28, 1889, an act "to amend sections 3, 6, 13, and 17 of an act entitled An act to more effectually secure competent and well qualified jurors in the several counties of this State," was passed. The changes made by the amendatory act are the following: Section 3 of the original act required that jurors should be selected from the male residents, &c., &c., "who are householders or freeholders," &c. The amendment eliminates the words quoted, and allows the selection to be made without reference to householders or freeholders. Section 6 of the original

act, among other things, provided that the president of the board of jury commissioners should keep the key to the jury-box, and the amendment requires that the key should be deposited with the county treasurer, and made certain verbal changes to accommodate this substantive amendment and harmonize the section. Section 13 of the original act, while undertaking to deal generally with the subject of peremptory challenges, failed entirely to provide the number of such challenges which should be allowed in capital cases, and there was no provision on this point in the act. The amendment merely supplies that omission, and prescribes that the defendant in a capital case shall have twenty-one, and the State fourteen peremptory challenges. In effecting each of these several amendments, the sections to which they pertain were re-enacted and published in full agreeably to constitutional requirements; and this course was pursued also in respect to the amendment made to section 17 of the original act, which we have set out in full, above. The sole change made in that section, aside from the mere verbal one incident to giving the section of the Code therein referred to the number it bears in the Code of 1886, was effected by omitting the counties of Clay and Marengo from among those excepted from the operation of the act, and thus bringing them within the statute. But, in reaching this result, the whole of section 17 was re-enacted, including its repeal of all conflicting laws, "general and special."

The special act of February 11, 1889, was, as we have seen, in conflict with the act of 1887 in several particulars, and, in so far, repealed the latter as to Jefferson county. The amendatory act of February 28, 1889, is in conflict with the special act passed at an earlier day of the same session, in the one particular as to the number of peremptory challenges to be allowed; the former allowing, as we have seen, twenty-one to the defendant, and fourteen to the State; and the latter only allowing the defendant ten, and the State five. If section 3 of the amendatory act, which, with the exceptions noted, is a reproduction and re-enactment of the repealing section of the original act, is to receive a literal construction and enforcement, its effect must be either to repeal the special act *in toto*, or to repeal it in so far as there is a repugnancy the one to the other. If the latter result is to follow, only that section of the special act which prescribes the number of peremptory challenges in capital cases shall be stricken down, and the various other provisions of the

[Maxwell v. The State.]

act as to setting such cases for trial, and the drawing, summoning and organizing special jurors and juries, &c., &c., will be allowed to stand, provided these provisions are capable of being executed without the repealed section.

Assuming for the moment that all other provisions of the special act are susceptible of operation and effect in the absence of that section which is in conflict with the amendatory general statute, the first inquiry is, whether the repealing clause of the latter act refers to statutes inconsistent with itself only, or to statutes in conflict with the original act of 1887 as amended by it; for, if the latter is the meaning we are to give to the repealing clause, it is very evident that no part of the special act can stand, since all of its provisions are, to a greater or less extent, inconsistent with the act of 1887. We do not, however, understand this to be the rule. The act of 1887, being repealed as to Jefferson county, by, and so far as in conflict with, the special act, the amendment of some of its sections did not have the effect to revive it as applicable to that county, except in those parts of it which were so amended and re-enacted. The fact that a repealed statute is referred to in a subsequent one, the reference not being intended as a re-enactment, will not give it vitality; and "even where the later act attempts to amend an earlier one, previously repealed by implication, the copying parts of the earlier act into the amendment was held not to re-enact it."—Endlich on Statutes, § 372; Stingel v. Nevel, 9 Ore. 62. Moreover, the constitutional requirement, that "no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only, but so much thereof as is revived, amended, extended, or conferred, shall be re-enacted and published at length," in our opinion, very clearly forbids that any part of the law of 1887, which had been repealed by the act of February 11, so far as Jefferson county is concerned, should be again brought into force in that territory, revived in, and extended to that county, without the re-enactment and publication at length of such parts or sections of the original law.—Rodgers v. Torbut, 58 Ala. 523; Stewart v. County Commissioners, 82 Ala. 209; Judson v. Bessemer, 87 Ala. 240. Our conclusion therefore is, that both the fact and the extent of the conflict between the special act and that of February 28, 1889, is to be determined by a reference to those acts alone, wholly disconnected with the act of 1887, original or as amended.

It seems clear, too, that giving to the repealing clause of the amendatory act the most sweeping effect demanded by its very letter, it can not be construed to repeal any, or *any part* of any, law not in conflict with that act. It provides for the repeal of "all laws and parts of laws" conflicting with its terms. This reference to parts of laws, taken in connection with the further provision, that all laws not in conflict shall continue in full force and effect, can mean nothing else than that such parts only of any statute are repealed, and those parts not in conflict shall be unaffected. And this we understand to be the rule, whenever the purpose or the effect of repeal is to destroy *conflicting* enactments, even where no reference is made to "parts of laws."—*Abernathy v. State*, 78 Ala. 411. Of course, if the section repealed leaves the statute so emasculated as that it can not be executed, the whole law falls, and its former field of operation would be covered by the general law. We see no reason, however, why the special law under consideration may not stand, and be fully executed as to all of its remaining provisions, without the section providing for the peremptory challenges, which is in conflict with the amendatory act. It is very true, that with the limited number of special jurors provided for in the special act, the allowance of the greater number of peremptory challenges which is provided for in the general law, would frequently result in exhausting the *venire* before a jury is obtained. But this result might, and frequently does, happen under the general law, and indeed will happen in every case under the general law, where the minimum number of special jurors are ordered, and both the State and defendant exhaust their peremptory challenges. So that this objection is one of degree rather than of kind, and raises a question of convenience rather than authority. And when such deficiency occurs, whether under the special or the general law, the power of the court is ample, and the same in either case, to summon a sufficient additional number of special jurors for the trial of any cause. If, therefore, the special law is affected at all by the repealing clause of the act of February 28, 1889, it is only to the extent of expunging section 8 of the former, and authorizing, instead of the number of challenges prescribed by it, the larger number prescribed by section 2 of the later act.

2. No question was made in the present case as to the number of peremptory challenges the parties or either of them were entitled to. Hence, having determined that no

part of the special law, unless it be section 8, was repealed by the subsequent act at the same session, the exigencies of this case do not require that we should go further and decide whether that section was repealed. Yet it is, perhaps, better that we should pass upon that question, in view of its importance in the administration of the criminal laws in Jefferson county, and the probability of its recurrence in this court, if not settled now. Its solution would involve no difficulty, of course, if the repeal relied on was one by implication. Such repeals, even where both statutes are general, are regarded with great disfavor in the law, and are not allowed except in cases of irreconcilable conflict.—Endlich on Stat. § 210; 3 Brick. Dig. p. 750, §§ 47, 48. And in no case will a repeal of a special act be implied from an inconsistent general law, even though the latter expressly repeal all contravening statutes.—*Faust v. Huntsville*, 83 Ala. 279. The doctrine was thus forcibly stated by Black, C. J., in a case which, like the present one, involved a statute affecting a county, and a later inconsistent enactment applying to the State: "It seems to be well setttled, that a general statute, without negative words, can not repeal a previous statute which is particular, even though the provisions of the one be different from the other. It is against reason to suppose that the legislature, in framing a general system for the State, intended to repeal a special act which the local circumstances of one county had made necessary."—*Brown v. County Commissioners*, 21 Pa. St. 37. And the presumption, as between general laws, as well as the rule where a general and a special law conflict, against repeal by implication, are strengthened where, as in this case, both acts are passed at the same session.—*McFarland v. State Bank*, 4 Ark. 146, 417; *Ottawa v. LaSalle*, 12 Ill. 339.

But, in the case at bar, the repeal insisted on is not one by implication merely. On the contrary, there is an *expressed* repeal of all laws and parts of laws, general and *special*, in conflict with the amendatory act. A part of the special act is so in conflict. We are reasonably satisfied that the legislature did not, in fact, intend to repeal the special act, or any part of it; but we reach this conclusion aside from, and even in spite of, any expressions the lawmakers have used. It is not reasonable to suppose that they intended the amendatory act, which had abundant field for operation outside of Jefferson county, to repeal a special act which they had just passed for that county. It seems clear,

too, that the re-enactment of the repealing clause of the
original act was only for the purpose of striking the coun-
ties of Clay and Marengo out of the *proviso* thereto, since
that was the only change made in its phraseology, and it
might well have been supposed, in view of constitutional re-
quirements, that to accomplish this purpose it was necessary
to set out the whole section. But, however clear we may be
as to the actual intent of the legislature, dissociated from
the language employed, the fact remains, that that language
evinces an entirely different intent; and however well as-
sured we may be that its use was inadvertent, we must be
guided by it. The office of construction is to ascertain what
the language of an act means, and not what the legislature
may have intended. "*Index animi sermo.* The court knows
nothing of the intention of an act, except from the words in
which it is expressed, applied to the facts existing at the
time, the meaning of the law being the law itself."—*Ed-
rick's Case*, 5 Rep. 118; *Logan v. Earl Courtown*, 13 Beav.
22; *Reiser v. Saving Fund Asso.*, 39 Pa. St. 137.

While there are circumstances under which the meaning
of words will be enlarged or restrained, or even entirely dis-
regarded, when the intent of the legislature, as gathered
from the whole act and other acts *in pari materia*, renders
it necessary; it would require a stronger case than is involved
here, before we could feel authorized, when the legislature
in terms repealed all *special*, or parts of special laws, in
conflict, &c., to say that they mean nothing by the very
plain language they employ; and this though we might be
morally certain, aside from the words, that the particular
result was never in fact present in their minds. Of such
case we adopt the language of Lord Campbell: " I can not
doubt," says his Lordship, "what the intention of the legis-
lature was; but that intention has not been carried into effect
by the language used. It is far better that we should abide
by the words of a statute, than seek to reform it according
to the supposed intention."—*Coe v. Lawrence*, 1 E. & B.
516. Our conclusion is, that the amendatory act repealed
section 8 of the special act, which prescribes the number of
peremptory challenges to be allowed in capital cases, and
leaves all other provisions of the act of Feb. 11, 1889, in
full force.

We have considered these questions more exhaustively,
perhaps, than was necessary, but feel justified in so doing
by their importance in this, and many other cases arising in
11

the county of Jefferson, and also because the able arguments on both sides merited a full response on our part.

3. Considering this case under the special act—section 8 thereof only being eliminated—we find no error in the action of the trial court in overruling defendant's motion in arrest of judgment, or in its rulings on these same points (or some of them), as shown in the bill of exceptions. The contention of appellant, that a time was fixed for the trial in his absence, is not supported by the record. It affirmatively appears that he was present on September 5, 1889, when an order was made setting the 25th day of the ensuing month for his trial; and that on the day last named, the prisoner again being present, the cause was formally, by an order of court, "*passed* until Monday, the 2d day of December, 1889." We know of no legal objection to the right and power of a court to determine, so far as it may see proper, the order of business at an ensuing term; and certainly the defendant could not have been put at a disadvantage by reason of the fact, that at the September term of the Criminal Court, a day was fixed in the *next* term for his trial. It would seem, on the contrary, that it was in his interest, and to his benefit, that he should be apprized of the time of his trial so long in advance of the day set, and thus have his opportunities to prepare for the trial enlarged. The day of trial being, as we think, regularly and properly set, the order of October 25th, that the cause be *passed* to December 2d following, can be reasonably held to mean nothing other than that the trial should be deferred to, and had on the day last named, and was an order setting that day for the trial. *Martin v. State,* 77 Ala. 1.

4. The special act dispenses with the presence of the defendant, both at the drawing and organization of the third jury to complete the *venire* for a capital case. We suppose the objection taken to the action of the court with respect to this matter in defendant's absence, proceeds on the assumption that the special law was not of force. Anyway the objection is untenable. Abstractly considered, the defendant has no more right to be present at the drawing and organization of these special jurors than when the regular jurors for the week of his trial are drawn and organized; and his absence in neither case can prejudice him, since, if present, he could interpose no objection to the proceeding. All his constitutional rights with respect to these jurors

[Maxwell v. The State.]

he is afforded an opportunity to assert when his case comes on for trial.

5. These considerations, in connection with the fact that the special law was of force and applied to all these proceedings, serve to determine all the grounds of the motion in arrest of judgment against the defendant, except those which bring in question the court's action in discharging two of the persons drawn for the special *venire* before defendant's cause was called for trial, and also one who had been drawn and summoned for the regular juries of the week. The act, we think, impliedly authorized the discharge of such persons under the circumstances shown; and if it does not, it appears to be well settled, that the discharge involves no reversible error.—*Fariss v. State,* 85 Ala. 1.

6-7. The fact that a certain negro "had lived on a part of the forty acres constituting the homestead of the defendant and wife," manifestly had no bearing whatever on any inquiry disclosed in this record; it was confessedly wholly irrelevant. Evidence of the fact was objected to; the objection was overruled, and an exception duly reserved. After this, the same witness, in answer to another question, stated that the homestead tract referred to was mineral land. Thereupon, as we read the bill of exceptions, the defendant moved to exclude both this and the answer as to occupation by the negro; and this motion was overruled, "upon the statement of the State's solicitor that he would connect with other evidence which would make it competent." Our opinion is, that the evidence as to the land containing minerals was relevant and competent, as tending to account for the presence of the deceased at defendant's house for a legitimate purpose, it having been shown that he "was looking after mineral lands" for the Sloss Steel & Iron Co. The motion being directed both against this testimony, which was legal, and that about the residence of the negro, which was illegal, was not well laid; and the defendant could not under it have the benefit of his objection and exception made and reserved, separately and independently, to the testimony that a negro had lived on the land. And this objection was not obviated by the solicitor's undertaking to connect it with other evidence in a way to make it relevant. That undertaking, as we have seen, did not apply to this evidence alone, and arose after the defendant had fully taken and perfected his separate exception. It follows that the position assumed

in argument, that it was the duty of the defendant, the solicitor having failed to connect this evidence, to call the court's attention to the fact, and again move to exclude it, is not tenable, even conceding this is necessary to put the court in error in respect to evidence admitted on an undertaking. of this kind, which we do not decide; and this action of the court upon which the first exception was based, is to be considered wholly aside from the subsequent statement of the solicitor, involving this and other evidence. So considered, we have the case of the admission against objection of palpably irrelevant testimony. It may be, indeed, it is highly probable, that this evidence did not prejudice the defendant. Nay further, we are utterly unable to see that it did or could have worked him injury. But, on the other hand, we *can not affirmatively see that it did not injure him*; and we do not feel that safety and certainty, which the rule even in civil cases requires to rebut the presumption of injury from error, that no harm was done which would warrant us in holding this error to have been without prejudice. 1 Brick. Dig. p. 780, § 106. And while my own opinion is, that in principle the rule should be the same in both civil and criminal cases, yet it can not be denied that it is much more strictly adhered to, in the sense of requiring greater assurance, if possible, that injury has not resulted, in the latter class of cases; if, indeed, our decisions have not established the absolute doctrine, that there is no such thing as error without injury in a criminal cause, except where it affirmatively appears that the defendant was benefitted by the ruling of which he complains.—*Vaughan v. State*, 83 Ala. 55; *Williams v. State*, 83 Ala. 16; *Mitchell v. State*, 60 Ala. 26; *Diggs v. State*, 49 Ala. 314; *Marks v. State*, 87 Ala. 99.

8. It is unnecessary to discuss the charges requested by the defendant in detail. All of them were, in our opinion, properly refused. Some were affirmatively bad, in that under the issue presented by the special plea of "not guilty by reason of insanity," they misplace the burden, and misstate the measure of proof: the burden in that issue being on the defendant, and requiring to its discharge at least a preponderance of evidence in support of the defense of insanity. It would be an anomaly to require the State to prove a fact which the law presumes to exist, and to authorize such fact to be overturned by the injection into the case of a reasonable doubt of its existence. Such is not the law.—Acts 1888–9,

pp. 742 *et seq.; Boswell v. State,* 63 Ala. 307; *Ford v. State,* 71 Ala. 385; *Parsons v. State,* 81 Ala, 577; *Gunter v. State,* 83 Ala. 96.

9. Moreover, all of said charges were misleading, in that they authorized the jury, if they found the issue under the special plea in favor of the defendant, to return a general verdict of "not guilty," without more, or at least tended to that result. The form of the verdict under the act cited above, "in relation to criminal insane persons who are charged by indictment with murder and other high crimes," is a matter of great importance, as upon that form depends the liberty of the defendant. If it be "not guilty" simply, the defendant is entitled to immediate enlargement. If "not guilty by reason of insanity," he stands acquitted of the crime, it is true, but he is not entitled to his liberty. On the contrary, such verdict is by statute made the basis of a judgment committing him to the insane asylum. The leading purpose of the statute was to separate, as far as possible, the two issues presented by the pleas of "not guilty" and "not guilty by reason of insanity," and to have the proof directed to these issues respectively, and the verdict responsive to them separately. In a case like this, where both pleas were interposed, it was essential that the jury should be directed and required to make their verdict speak with distinctness to that one of the issues which they found in favor of the defendant; and any charge which, while authorizing acquittal of the offense, failed to require this, or tended to authorize the jury to render a general verdict of not guilty, when their conclusion of innocence might have been based on the theory of the defendant's insanity, is misleading, and should not be given.

For the error pointed out above in the admission of evidence, the judgment is reversed, and the cause remanded.