This appeal follows a conviction for the offense of driving under the influence of drugs or alcohol, in violation of §32-5A-191, Code of Alabama (1975). For the reasons outlined below, the conviction is affirmed. *Page 287 
The sole issue presented for review is stated in the appellant's brief as follows: "Whether there were sufficient grounds or probable cause to stop appellant's vehicle and then arrest him for D.U.I." According to the appellant, he was improperly subjected to an "investigatory stop" which resulted in his arrest for D.U.I.
The State's evidence tended to show that at approximately 2:45 on the morning of November 25, 1984, Officer Chris Street, Shelby County Sheriff's Department, observed a vehicle which had pulled off on the side of the road. The emergency or "hazard" lights were flashing on the vehicle and Officer Street proceeded to determine if there was "a problem" or if he could "help." Officer Street testified as follows:
 "[Officer Street]: I observed the vehicle parked on the side of the road with the emergency running lights on. I pulled beside the vehicle to see if there was a problem to see if I could help.
 "[State's Attorney]: Do you remember when that was approximately?
"A November 25, 1984; 2:46 a.m.
". . .
"Q What, if anything, occurred [then]?
 "A I observed the defendant taking a drink from some type of bottle. I parked my patrol car behind him and turned my blue lights on, and then he pulled off south on [Highway] 17 and turned onto Riverchase Parkway or whatever, and then into the Harbert Exxon.
"Q Where was he when you first observed him?
 "A He was parked on the paved shoulder of the roadway, County Road 17, southbound direction.
". . .
 "Q When you pulled up along side of him, which side did you pull up on?
"A I pulled up on the driver's side.
"Q And where was the defendant at that time?
"A He was under the steering wheel.
". . .
 "Q What was he doing at the time when you first saw him?
 "A As I said he appeared to be taking a drink of something.
"Q And you backed up?
"A Yes, sir.
"Q What happened after that, please, sir?
 "A I backed behind his vehicle, turned on my blue lights. Then he proceeded to drive off in the direction he was headed."
Officer Street testified that he followed the appellant for a short distance, with his "blue light" flashing, until the appellant turned into the service station. Officer Street continued his testimony as follows:
"Q What, if anything, occurred next?
 "A [The appellant] got out of his vehicle and he was still drinking from the Sprite bottle at that time. He finished it off as I walked up to him.
"Q Did you observe what was in the Sprite bottle?
"A No sir. As I said he drank it all.
 "Q What, if anything, did he say to you or you say to him at that time?
 "A I asked to see [the appellant's] driver's license, which he produced. And I could smell the alcohol on his breath. There was another occupant in the vehicle who appeared to be asleep or passed out. I asked [the appellant] to put his hands on the vehicle at such time to inspect the cab of the truck and the other occupant for any weapons or whatever.
". . .
"Q What, if anything, occurred next?
 "A I then placed [the appellant] under arrest for suspected D.U.I.
 "Q Did you have an occasion at that time to inventory the contents of the vehicle?
 "A Yes sir. He had left his driver's door open. I shined my flashlight around in there and I saw a couple of whiskey bottles and vodka bottles and the other person."
Officer Street testified that after the appellant was placed under arrest, he was transported *Page 288 
to police headquarters and was given a P.E.I. test. Officer Street also testified that he observed in the cab of the pickup truck two vodka bottles, one of which was empty and the other with only a small amount remaining.
Officer Street testified that when the appellant stepped out of the truck, he was still drinking from the Sprite bottle and it was "running from his face." Officer Street testified that the appellant had "slurred speech" and was "staggering when he walked." Officer Street also stated that the appellant "smelled of alcohol." Frank Formby, Pelham Police Department, testified that he administered a P.E.I. test to the appellant on the morning in question and determined that the appellant's blood alcohol content was .109 percent.
The appellant took the stand and testified that, on the night in question, he, along with his son, went to the V.F.W. Club in Fairfield. The appellant stated that they arrived at the club around 9:00 p.m., and that they did not leave the club until 2 o'clock the next morning. During this five-hour period, the appellant stated, he drank four mixed drinks, consisting of vodka mixed with Sprite. The appellant stated that they started home but that about seven or eight miles from the appellant's home in Pelham, he pulled over to drink some Sprite because he was getting sleepy, and that while he was drinking the Sprite, he observed in his rear view mirror a car that did not have its headlights on. According to the appellant, it was not until he pulled back on to the highway that he saw the police officer's "blue lights." The appellant stated that he pulled over at a filling station. The appellant continued to testify, as follows:
 "[Defense attorney]: On that night, how were your faculties? Were you sloppy looking?
"A [Appellant]: No. I was not sloppy looking.
 "Q Well, in your own opinion, tell the court what condition were you in? Were you able to drive?
 "A I was able to drive. I was not weaving. I was aware of what I was doing, and like I say, I was sleepy and pulled off of the side of the road and I was going to drink that Sprite. That Sprite has got a little caffeine in it, and I parked for about two minutes. And I don't know whether it was him [the police officer] or not but there was a car behind me with the lights off. In other words, when I stopped there I never did cut my lights off.
 "When I pulled off and got back on the road, I noticed that there were blue lights behind me so I just pulled down there off the road towards the filling station."
The appellant also testified that his son was "drunk" and had fallen asleep in the truck.
The appellant recognizes that, by statute, a police officer is authorized to investigate certain activity which occurs in a "public place." Section 15-5-30, Code of Alabama (1975). This statute, which has been referred to as the "Alabama Stop and Frisk Law,"[1] provides as follows:
 "A sheriff or other officer acting as sheriff, his deputy or any constable, acting within their respective counties, any marshal, deputy marshal, or policeman of any incorporated city or town within the limits of the county or any highway patrolman or state trooper may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address and an explanation of his actions."
In this case, according to the appellant, there was insufficient evidence to warrant a "stop" of his vehicle. According to the appellant, the mere fact that he was observed drinking from a bottle while "legally *Page 289 
parked" on the side of the road with his emergency flashers on, does not justify the "stop" and subsequent arrest. Because there was no basis for the initial stop, according to the appellant, the subsequent arrest was "illegal."
Under the authority of § 15-5-30, as quoted above, however, a police officer has the authority to stop and question a person for investigatory purposes "even though the circumstances that prompted the officer to detain the individual fall short of the probable cause requirement under § 15-10-3, Code of Alabama
1975." Swicegood v. State, 448 So.2d 433, 434 (Ala.Cr.App. 1983). The "probable cause" requirement which applies to the arrest of an individual need not be met where an individual is stopped by a police officer for mere "investigatory detention." As this court, per Presiding Judge Bowen, reasoned in Crawleyv. State, 440 So.2d 1148, 1149-50 (Ala.Cr.App. 1983):
 "[T]o stop a person for questioning or investigatory detention does not require probable cause. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889
(1968); Bagony v. City of Birmingham, 371 So.2d 80
(Ala.Cr.App. 1979); Ala. Code § 15-5-30 (1975); 3 Search §§ 9.1 through 9.6. The officer need only be able to articulate specific facts and inferences that lead to a reasonable suspicion of criminal activity. Terry, 392 U.S. at 21, 88 S.Ct. at 1879. The degree of reasonable suspicion necessary to make a stop was articulated in United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 694-695, 66 L.Ed.2d 621 (1981): `(b) based upon the whole picture the determining officer must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'
 "`A policeman who lacks the precise level of information necessary for probable cause to arrest is not required simply to shrug his shoulders and allow a crime to occur or a criminal to escape, and a brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in the light of the facts known to the officer at the time.' 6A C.J.S. Arrest, § 38 (1975)."
Contrary to the appellant's argument that there was no "probable cause" for the initial stop, it is apparent that there was sufficient "reasonable suspicion" to justify the initial stop. In fact, the police officer's actions constituted "good police work," which was expressly approved by the Terry
court. Childress v. State, 455 So.2d 175, 176 (Ala.Cr.App. 1984), quoting Herrin v. State, 349 So.2d 103 (Ala.Cr.App.),cert. denied, 349 So.2d 110 (Ala. 1977).
Here, as in Walton v. State, 461 So.2d 894 (Ala.Cr.App. 1984), there was sufficient information available to Officer Street to justify his "intrusion into the appellant's activities." Some of these factors include the unusual hour of the morning; the presence of the truck on the side of the road; the blinking "hazard" or emergency lights; and the observation of the appellant drinking something from a bottle while he was "under" the steering wheel. These factors made Officer Street's "investigatory actions" proper and "neglect to take those actions would have amounted to poor professional judgment."Walton, supra, citing Butler v. State, 380 So.2d 381
(Ala.Cr.App. 1980). In a recent case, this court concluded that a police officer's initial investigation of a vehicle and its occupants was justified because "one of the functions of a law enforcement officer is to render assistance to motorists."Myers v. State, 431 So.2d 1342, 1344 (Ala.Cr.App. 1982), cert.quashed, 431 So.2d 1346 (Ala. 1983).
In a case which is factually similar to the present case, this court, per Judge Taylor, concluded that police officers had "reasonable suspicion" to stop and investigate the appellant's activities when he was observed, parked on the side of a highway, with the hood of his car up, putting gasoline into the car. Fowler v. State, 453 So.2d 1089, 1090
(Ala.Cr.App. 1984). Although the appellant, in Fowler, was observed in the close vicinity of a robbery, *Page 290 
certain language in the Fowler case applies to the present facts:
 "In some situations, a stop and frisk is only a minor inconvenience or a petty indignity compared to the government's greater interest in detecting or preventing crime. It is certainly not unusual for police officers to check on an automobile stopped along the side of a highway. Such a stop might be made simply to offer assistance to a stranded motorist. In this instance, we find that the rather difficult balancing test required by the Terry case weighs solidly in favor of the investigating officers. (Citation omitted.)" Id. at 1091.
Here, Officer Street had sufficient "reasonable suspicion" to justify the initial stop. As a result of the stop, Officer Street then observed sufficient evidence of criminal activity to establish "probable cause" for the appellant's arrest. Appellant's claims are without merit.
AFFIRMED.
All the Judges concur.
[1] Fowler v. State, 453 So.2d 1089, 1090 (Ala.Cr.App. 1984);Swicegood v. State, 448 So.2d 433, 434 (Ala.Cr.App. 1983). *Page 848