Rel: March 13, 2026

**Notice:** This opinion is subject to revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

————————————————

### SC-2025-0372

————————————————

**Michael Jerome Jennings**

**v.**

**Christopher Smith, Justin Gable, Jeremy Brooks, and the City of Childersburg**

**Certified Question from the United States District Court for the Northern District of Alabama, Eastern Division**

**(1:22-cv-01165-RDP)**

SELLERS, Justice.

The United States District Court for the Northern District of

Alabama, Eastern Division ("the district court"), has certified to this

Court a question pursuant to Rule 18, Ala. R. App. P. This Court

accepted and answers the question.

## I. Certified Question

"Under [Ala. Code 1975,] § 15-5-30, when a law enforcement
officer asks a person for his name, address, and explanation
of his actions, and the person gives an incomplete or
unsatisfactory oral response, does the statute prohibit the
officer from demanding or requesting physical identification?"

## II. Ala. Code 1975, § 15-5-30

Section § 15-5-30, the statute referenced in the certified question,

is often referred to as Alabama's "stop and identify" statute. That section

provides:

"A sheriff or other officer acting as sheriff, his deputy or
any constable, acting within their respective counties, any
marshal, deputy marshal or policeman of any incorporated
city or town within the limits of the county or any highway
patrolman or state trooper may stop any person abroad in a
public place whom he reasonably suspects is committing, has
committed or is about to commit a felony or other public
offense and may demand of him his name, address and an
explanation of his actions."

(Emphasis added.)

## III. Factual Background and Procedural History

On May 22, 2022, Officers Christopher Smith, Justin Gable, and

Jeremy Brooks of the Childersburg Police Department responded to an

emergency-911 call in which a female had requested that someone check on her elderly neighbors' house. The caller conveyed that her neighbors had gone out of town and that she had observed an unfamiliar vehicle and a "younger black male" around their house. Officer Smith, who arrived at the house first, saw a black male watering flowers with a garden hose. In relevant part, Officer Smith asked the man if he lived at the house, and the man responded that he did not. Officer Smith explained that someone had called about a vehicle and a person being on the property who was not supposed to be there. The man replied that he was supposed to be there, that his name was Pastor Jennings, that he lived across the street, that he was looking out for the house while the neighbors were gone, and that he was watering their flowers. Officer Smith then asked the man if he had any identification, at which time the man became very agitated and stated that he would not provide any identification. Officers Gable and Brooks subsequently arrived at the house, at which time the conversation between the officers and the man escalated. After repeatedly refusing to talk to the officers and to properly identify himself, the man was placed under arrest and charged with obstructing a governmental function in violation of Ala. Code 1975, §

3

13A-10-2(a)(2).[1]   The man arrested was subsequently identified as Michael Jerome Jennings.

After the obstruction charge against Jennings was dismissed, he commenced in the district court an action against the officers under 42 U.S.C. § 1983, alleging unlawful and retaliatory arrest, among other things.[2]   He also sued the officers and the City of Childersburg ("the City") under Alabama law, alleging false arrest.  The officers moved for a summary judgment, and the City moved to dismiss.  Citing immunity, the district court granted both motions.  The district court found that, by refusing to give his complete name, Jennings violated § 15-5-30, thus intentionally preventing the officers from performing a governmental function.  See § 13A-10-2(a)(2).

Jennings appealed.  The United States Court of Appeals for the Eleventh Circuit ("the Eleventh Circuit") entered an order reversing the

---

[1]Section 13A-10-2(a)(2), Ala. Code 1975, makes it a crime to "[i]ntentionally prevent[] a public servant from performing a governmental function." A violation of that provision is a Class A misdemeanor.

[2]Section 1983 imposes liability on a "person" who, under color of law, deprives another "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983.

decision of the district court. In doing so, the Eleventh Circuit relied on Edger v. McCabe, 84 F.4th 1230 (11th Cir. 2023) (interpreting § 15-5-30 as prohibiting law-enforcement officers from requesting physical identification from a suspect). On remand from the Eleventh Circuit, the district court expressed its concern regarding an unpublished opinion issued by the Eleventh Circuit that, the district court felt, created uncertainty concerning how § 15-5-30 should be interpreted. See Metz v. Bridges, No. 23-11275, Dec. 12, 2024 (11th Cir. 2024) (not reported in Federal Reporter) (interpreting § 15-5-30 as giving probable cause to arrest a suspect for his failure to comply with a law-enforcement officer's request for identification during a lawful stop initiated under Terry v. Ohio, 392 U.S. 1 (1968)). Thus, the district court certified its question regarding the interpretation of § 15-5-30 to this Court pursuant to Rule 18(a), which provides that this Court may answer questions from federal courts only when "there are no clear controlling precedents" and the answer to the question is "determinative of said cause."

## IV. Discussion

Under § 15-5-30, an officer may request a person's "name, address and an explanation of his actions" when the officer reasonably suspects

5

that the person "is committing, has committed or is about to commit a felony or other public offense." In <u>Hopkins v. State</u>, 661 So. 2d 774, 778 (Ala. Crim. App. 1994), the Alabama Court of Criminal Appeals stated that § 15-5-30 is a codification of the principles announced in <u>Terry</u>, <u>supra</u>. In <u>Terry</u>, the United States Supreme Court established the constitutional framework for brief investigatory stops, commonly known as <u>Terry</u> stops. Under <u>Terry</u>, an officer is permitted to detain a person for a brief investigatory stop if the officer has reasonable suspicion that the person is engaged in, or is about to be engaged in, criminal activity. <u>Terry</u>, 392 U.S. at 10. The officer's actions in briefly detaining a person must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." <u>Terry</u>, 392 U.S. at 20. <u>See</u> <u>also</u> <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983) (noting that, in analyzing the scope of a <u>Terry</u> stop, it is clear that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop" and that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time").

6

In <u>Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County</u>, 542 U.S. 177 (2004), the United States Supreme Court applied the principles of <u>Terry</u> in determining whether a Nevada statute, Nev. Rev. Stat. 171.123, requiring a suspect to identify himself or herself during a lawful <u>Terry</u> stop, was consistent with the Fourth Amendment prohibition against unreasonable searches and seizures. In relevant part, the Nevada statute permits a law-enforcement officer to detain a person "only to ascertain the person's identity and the suspicious circumstances surrounding the person's presence abroad." Nev. Rev. Stat. 171.123(3). According to <u>Hiibel</u>, the Nevada Supreme Court has interpreted the statute as requiring only that a person disclose his or her "name" to an officer when reasonable suspicion exists to detain the person. <u>Hiibel</u>, 542 U.S. at 185.

The central question in <u>Hiibel</u> was whether Larry Hiibel, a suspect detained during a valid <u>Terry</u> stop, could be arrested and prosecuted for refusing to identify himself as required by the Nevada statute.[3] The

---

[3]The Court recounted the following pertinent facts in <u>Hiibel</u>:

"The sheriff's department in Humboldt County, Nevada, received an afternoon telephone call reporting an assault. The caller reported seeing a man assault a woman in a red and

<u>Hiibel</u> Court began its analysis by explaining that "questions concerning a suspect's identity are a routine and accepted part of many <u>Terry</u> stops." 542 U.S. at 186. The Court specifically noted that obtaining a suspect's identity during a <u>Terry</u> stop serves important government interests:

> "Obtaining a suspect's name in the course of a <u>Terry</u> stop serves important government interests. Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder. On the other hand, knowing identity may help clear a suspect and

---

> silver GMC truck on Grass Valley Road. Deputy Sheriff Lee Dove was dispatched to investigate. When the officer arrived at the scene, he found the truck parked on the side of the road. A man was standing by the truck, and a young woman was sitting inside it. The officer observed skid marks in the gravel behind the vehicle, leading him to believe it had come to a sudden stop.
>
> "The officer approached the man and explained that he was investigating a report of a fight. The man appeared to be intoxicated. The officer asked him if he had 'any identification on [him],' which we understand as a request to produce a driver's license or some other form of written identification. … The officer asked for identification 11 times and was refused each time. After warning the man that he would be arrested if he continued to refuse to comply, the officer placed him under arrest."

542 U.S. at 180-81. Hiibel was charged and convicted under a Nevada statute for obstructing a public officer in discharging or attempting to discharge his duties; Hiibel challenged his conviction on Fourth and Fifth Amendment grounds.

allow the police to concentrate their efforts elsewhere. … Officers called to investigate [suspected criminal activity] need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim."

Hiibel, 542 U.S. at 186. See also Hiibel v. Sixth Jud. Dist. Ct., 118 Nev. 868, 874, 59 P.3d 1201, 1205-06 (2002) ("Additionally, if suspects are not legally required to identify themselves, what could an officer do if a suspicious person were loitering outside a daycare center or school? Perhaps that person is a sex offender. How are officers to enforce restraining orders? Or, how are officers to enforce curfew laws for minors without a requirement to produce identification? In these situations, it is the observable conduct that creates a reasonable suspicion, but it is the requirement to produce identification that enables an officer to determine whether the suspect is breaking the law.").

The Hiibel Court went on to explain that, although it well established that an officer "may ask a suspect to identify himself in the course of a Terry stop, it has been an open question whether the suspect can be arrested and prosecuted for refusal to answer." 542 U.S. at 186-87. Hiibel confirmed that, although "the Fourth Amendment itself cannot require a suspect to answer questions," id. at 187, in Hiibel's case,

9

the source of the obligation to respond arose from the Nevada statute, which, like § 15-5-30, is often referred to as a stop-and-identify statute. See Hiibel, 542 U.S. at 183 ("Stop and identify statutes often combine elements of traditional vagrancy laws with provisions intended to regulate police behavior in the course of investigatory stops. The statutes vary from State to State, but all permit an officer to ask or require a suspect to disclose his identity."). In discussing whether the Nevada statute satisfied the "reasonableness" standard for searches and seizures under the Fourth Amendment, the Hiibel Court explained that "reasonableness" is determined by balancing the degree of intrusion upon a person's constitutionally protected rights against the statute's promotion of legitimate government interests. 542 U.S. at 187-88. The Hiibel Court reasoned that the public interest in police and public safety outweighed Hiibel's interest in refusing to identify himself. The Court further explained that a "request for identity" under the Nevada statute has "an immediate relation to the purpose, rationale, and practical demands of a Terry stop" and that "[t]he threat of criminal sanction helps ensure that the request for identity does not become a legal nullity." 582 U.S. at 188. On the other hand, the Court noted that the Nevada statute

did not alter the nature of a <u>Terry</u> stop, because the statute did not change the nature or scope of the stop itself. <u>Id.</u> <u>See</u> <u>also</u> <u>Royer</u>, 460 U.S. at 500 (noting that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop" and that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time"). Thus, the <u>Hiibel</u> Court concluded that a state law requiring a suspect to disclose his or her name in the course of a valid <u>Terry</u> stop is consistent with Fourth Amendment prohibitions against unreasonable searches and seizures:

> "It is clear in this case that the request for identification was 'reasonably related in scope to the circumstances which justified' the stop. <u>Terry</u> [<u>v. Ohio</u>, 392 U.S. 1,] 20 [(1968)]. The officer's request was a commonsense inquiry, not an effort to obtain an arrest for failure to identify after a <u>Terry</u> stop yielded insufficient evidence. The stop, the request, and the State's requirement of a response did not contravene the guarantees of the Fourth Amendment."

542 U.S. at 188-89. Although the <u>Hiibel</u> Court concluded that the Nevada statute was consistent with Fourth Amendment prohibitions against unreasonable searches and seizures, it left open the question whether a request for identifying information beyond a name would be a violation

11

of the Fourth Amendment or would be beyond the scope of the statute.[4]

See Hiibel, 542 U.S. 185 ("As we understand it, the [Nevada] statute does not require a suspect to give the officer a driver's license or any other document. Provided that the suspect either states his name or communicates it to the officer by other means -- a choice, we assume, that the suspect may make -- the statute is satisfied and no violation occurs.").

Based on the analysis provided in Hiibel, we conclude that § 15-5-30 does not exclude from its purview a request for physical identification when a suspect provides an incomplete or unsatisfactory response to an officer's demand to provide his or her name and address and an explanation of his or her actions. Obtaining a person's identity is a crucial part of a Terry stop. See United States v. Hensley, 469 U.S. 221, 229 (1985) ("[T]he ability to briefly stop [a suspect], ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice."); INS v. Delgado, 466 U.S. 210, 216 (1984) ("[I]nterrogation relating to

---

[4]See Douglas v. City of Jeannette (Pennsylvania), 319 U.S. 157, 163 (1943) (noting that, with respect to state law, "state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted").

one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."); and Wright v. State, 601 So. 2d 1095, 1096 (Ala. Crim. App. 1991) ("Inherent in an officer's right to stop a suspect and demand his name, address, and an explanation of his actions is the right to detain him temporarily to verify the information given or to obtain information independently of the suspect's cooperation.").  We also find persuasive the rationale stated in City of Missoula v. Kroschel, 391 Mont. 457, 465, 419 P.3d 1208, 1217 (2018): "If not the functional or substantive equivalent of requesting a person's name and current address, demanding available proof of identification is typically likewise reasonably related to the purpose of an investigative stop for Fourth Amendment purposes."[5] Thus, although § 15-5-30 does not expressly authorize law-enforcement officers to request information other than a person's name and address and an explanation of his or her actions, nothing in the language or legislative history of the statute indicates any legislative intent to prohibit officers from asking

_____

[5]Much like § 15-5-30 at issue here, the statute in Missoula permitted "law enforcement officers [to] request a person's name, current address, and 'an explanation' of the person's conduct in relation to the officer's particularized suspicion for the stop."  391 Mont. At 465, 419 P.3d at 1217.

13

questions regarding identity that would be permissible under the Fourth Amendment within the limited scope of a valid <u>Terry</u> stop. The principles of <u>Terry</u> presume that an officer's request for additional identifying information will be reasonably related to the circumstances of the stop and will not seek information unrelated to identifying the suspect.

In summary, Alabama law is clear -- once an officer has reasonable suspicion to believe that a suspect is committing, has committed, or is about to commit a felony or other public offense, § 15-5-30 empowers the officer to demand that the suspect disclose his or her name and address in a format that would allow the officer to affirmatively identify the suspect.  As indicated above, establishing a suspect's correct identity furthers an important governmental function by allowing an officer to confirm whether a suspect is violating the law or by eliminating the suspect from suspicion.  If the officer's demand for a name and address is not heeded, then the officer is faced with choices. The officer can either arrest the suspect for intentionally preventing the officer from performing a governmental function in violation of § 13A-10-2(a)(2) or delay the arrest and supplement the demand by asking for more conclusive positive identification. Either way, the suspect bears the

burden to completely identify himself or herself during a valid <u>Terry</u> stop; thus, failing to provide sufficient identifying information when demanded to do so violates Alabama law.

QUESTION ANSWERED.

Wise and Parker, JJ., concur.

Bryan and Cook, JJ., concur specially, with opinions.

Shaw, J., concurs in the result, with opinion.

Mendheim, J., dissents, with opinion, which Stewart, C.J., and McCool, J., join.

BRYAN, Justice (concurring specially).

Although I concur in the main opinion, I also agree with the sentiments expressed in Justice Shaw's special writing.

COOK, Justice (concurring specially).

I concur with the main opinion that § 15-5-30, Ala. Code 1975, does not <u>prohibit</u> an officer from either "<u>demanding</u> or <u>requesting</u> physical identification" when a suspect gives an "<u>incomplete or unsatisfactory oral response</u>." (Emphasis added.)

I also agree with the main opinion that the statute <u>authorizes</u> an officer to do so. While I recognize that this additional conclusion goes beyond the strict bounds of the question that has been certified to us, the parties have discussed this issue in the briefing, and I believe the textual analysis for this question is interwoven with answering the certified question before us, especially in light of the phrasing of an ancillary question provided in a footnote by the federal court in this case.[6]

---

[6]I note that, in its order certifying the question now before us, the United States District Court for the Northern District of Alabama included the following related question in a footnote:

> "Is the word 'demand' meaningfully different from a word like 'request' in that it <u>allows</u> an officer to both ask for the information specified in § 15-5-30 and <u>take follow-up steps</u> to verify the information if the suspect answers those questions in an incomplete or non-credible way."

<u>Jennings v. Smith</u>, No: 1:22-cv-01165-RDP, May 22, 2025 (N.D. Ala. 2025) (emphasis added). That question is the next logical step after determining whether a demand for identification is prohibited and, thus,

I write separately to explain why a textual analysis supports the main opinion's conclusions and to emphasize the precision of our answer.

## I. Alabama Courts Construe Statutes According to Their Plain Language

When interpreting statutes, we "'determine and give effect to the intent of the legislature as manifested in the language of the statute.'" Pruitt v. Oliver, 331 So. 3d 99, 111 (Ala. 2021) (quoting Ex parte State Dep't of Revenue, 683 So. 2d 980, 983 (Ala. 1996)). "[T]he process of ascertaining a law's intent is an objective exercise focused on the statute's text, not a subjective one focused on lawmakers' unexpressed goals or desires." Jay Mitchell, Textualism in Alabama, 74 Ala. L. Rev. 1089, 1101 (2023); see also Maxwell v. State, 89 Ala. 150, 161, 7 So. 824, 827 (1890) ("'The court knows nothing of the intention of an act, except from the words in which it is expressed, applied to the facts existing at the time; the meaning of the law being the law itself.'" (citation omitted)). This

---

is also before us. See, generally, Stewart Title Guar. Co. v. Shelby Realty Holdings, LLC, 83 So. 3d 469, 471 n.2 (Ala. 2011) ("'[T]his Court will rephrase a question certified to it in order to address the "basic issue implicated by th[e] question" and "contemplated by the [court] in its certification."'" (quoting Holcim (US) Inc. v. Ohio Cas. Ins. Co., 38 So. 3d 722, 726-27 (Ala. 2009), quoting in turn John Deere Co. v. Gamble, 523 So. 2d 95, 99 (Ala. 1988))).

means that "'the language of the statute is conclusive.'" <u>Pruitt</u>, 331 So. 3d at 111 (quoting <u>State Dep't of Revenue</u>, 683 So. 2d at 983). We will thus give the words their "'natural, ordinary, commonly understood meaning'" and will bind ourselves to "'interpret that language to mean exactly what it says.'" <u>Id.</u>

Here, the language of § 15-5-30 says that an officer "may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address and an explanation of his actions."

### A. An Officer Is Not Prohibited From "Requesting" Physical Identification

To begin with the easiest part of the question before us, the text of the statute does not "prohibit" an officer from "request[ing]" "physical identification," and it certainly does not do so if the officer has met the reasonable-suspicion standard of <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).[7]  I do

---

[7]The reasonable-suspicion standard articulated in <u>Terry</u> mirrors the standard set forth in § 15-5-30. Under <u>Terry</u>, an officer may conduct a brief investigatory stop "where [he] observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." 392 U.S. 1 at 30. Section 15-5-30 similarly authorizes an officer to "stop any person abroad in a public place whom

not view this as a close question. First, the text of the statute says nothing that could remotely be interpreted as prohibiting a request for identification or anything else. Certainly, "the broad background rule is that the police may ask members of the public questions and make consensual requests of them." Edger v. McCabe, 84 F.4th 1230, 1239 (11th Cir. 2023) (citing Florida v. Bostick, 501 U.S. 429, 434-35 (1991)); see also T.D.F. v. State, 264 So. 3d 108, 117-18 (Ala. Crim. App. 2018) ("[U]nless the police have reasonable suspicion or probable cause to stop an individual, the police may be ignored.").

And, if there was any doubt in this case, even Michael Jerome Jennings agrees. During oral argument, his counsel expressly conceded that the officer could "request" or "ask" for physical identification.[8] His

---

he reasonably suspects is committing, has committed or is about to commit a felony or other public offense." Alabama courts have recognized this correspondence and have applied Terry's framework directly to the statute. See, e.g., Butler v. State, 380 So. 2d 381, 383 (Ala. Crim. App. 1980) (treating § 15-5-30's reasonable-suspicion requirement as coextensive with Terry).

[8]See Supreme Court of Alabama, Supreme Court O/A Montgomery, Alabama, YouTube (January 7, 2026, 7:43-7:55) ("Well, [the officer] can ask for ID. The question is can they compel ID. And the officer can ask for ID initially when they -- when they approach the person. They can ask for it. But the question is not whether they can ask. The issue is not ask. The issue is demand." (emphasis added)) (at the time this decision

counsel also expressly conceded during oral argument that the stop in this case was a valid stop.[9]

Finally, while the statute does not use the word "request," it states that an officer may "demand" certain information. "Demand" is certainly stronger than "request." Thus, if the officer can "demand" the physical identification, the officer can certainly "request" it.

### B. An Officer Is Not Prohibited From Demanding Physical Identification Under These Facts

### i. The Meaning of the Terms in § 15-5-30

As to whether an officer can "demand" physical identification under § 15-5-30, I start with the operative definitions of the key words in that statute: "demand," "name," and "address."[10]

---

was issued, this oral-argument session could be located at: https://www.youtube.com/watch?v=-U3qeHk2rFk).

[9]See Supreme Court of Alabama, Supreme Court O/A Montgomery, Alabama, YouTube (January 7, 2026, 3:30-3:32) ("I would agree this was a valid Terry stop." (emphasis added)) (at the time this decision was issued, this oral-argument session could be located at: https://www.youtube.com/watch?v=-U3qeHk2rFk).

[10]As I have written before: "I believe that we are required to apply the 'original public meaning' of the words in a statute or our Constitution, thus ensuring that we do not apply our own subjective meaning to the words used." Ex parte Underwood, [Ms. SC-2024-0263, June 7, 2025] ___ So.3d ___, ___ n.4 (Ala. 2025) (Cook, J., concurring specially) (citing New Prime Inc. v. Oliveira, 586 U.S. 105, 113

A "demand" is the assertion of a legal right and in its verbal form can mean "[t]o claim as one's due" or "to require." <u>Black's Law Dictionary</u> 516-17 (4th ed. 1951).[11] It can involve "requiring [a person] to do or yield something." <u>Id.</u> These definitions indicate that an officer may require identifying information because he or she has an affirmative legal right to it. The officer is not at the mercy of an unwilling suspect. Rather, the officer must be able to receive that to which he or she has a right.

_____

(2019) ("'[I]t's a "fundamental canon of statutory construction" that words generally should be "interpreted as taking their ordinary ... meaning ... at the time Congress enacted the statute."'" (citations omitted))); <u>see also</u> Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 82-83 (Thomson/West 2012) ("Originalism is the <u>only</u> approach to text that is compatible with democracy. When government-adopted texts are given new meaning, the law is changed; and changing written law, like adopting written law in the first place, is the function of the first two branches of government -- elected legislators and … elected executive officials and their delegates."); Jay Mitchell, Textualism in Alabama, 74 Ala. L. Rev. 1089, 1092 (2023) ("[T]he meaning of a law is its <u>original public</u> meaning, not its <u>modern</u> meaning.").

[11]I cite the fourth edition of <u>Black's Law Dictionary</u> here because it is a contemporaneous dictionary to the original passing of this statute in 1966. <u>See, e.g.</u> <u>Maxwell v. State</u>, 89 Ala. 150, 161, 7 So. 824, 827 (1890) (emphasizing connecting the language of a statute to "'facts existing at the time'"(citation omitted)); <u>National Labor Rels. Bd. v. Canning</u>, 573 U.S 513, 527 (2014) (citing founding-era dictionaries to determine the meaning of "recess"); <u>Wisconsin Cent. Ltd. v. United States</u>, 585 U.S. 274, 277-78 (referencing a 1942 dictionary in interpreting the meaning of "money" in a 1937 statute).

Applying those definitions to the statute now before us, it seems clear to me that the plain language of § 15-5-30 gives an officer the right to receive the suspect's name and address.

Next, a "name" is "[t]he designation of an individual person, or of a firm or corporation." Black's Law Dictionary 1174 (4th ed. 1951). This consists of "one or more … given names and one surname or family name." Id. Applying this definition to § 15-5-30, we must conclude that an officer has the right to a given name and a surname.

As the Supreme Court has recognized, this reading "serves important government interests." Hiibel v. Sixth Jud. Dist. Court of Nev., Humboldt Cnty., 542 U.S. 177, 186 (2004). Our appellate courts have agreed and have acknowledged that the statute's purpose is investigatory in nature. See, e.g., Manning v. State, 612 So. 2d 1262, 1264 (Ala. Crim. App. 1992) ("The State of Alabama has codified the investigative stop at § 15-5-30 …." (emphasis added)); Scurlock v. State, 487 So. 2d 286, 289 (Ala. Crim. App. 1986) ("Under the authority of § 15-5-30 … a police officer has authority to stop and question a person for investigatory

23

purposes …." (emphasis added)).[12] The only kind of name that can affirmatively identify a person for the purposes of a police investigation is at least a given name and a surname. Cf. Ex parte Jefferson Cnty. Bd. of Educ., [Ms. SC-2024-0756, Apr. 4, 2025] ___ So. 3d ___, ____ (Ala. 2025) (recognizing that for civil-pleading purposes "a pleader who knows only a person's partial name does not know that person's identity …."). A suspect who says that his name is "Bob" or "Sparky" does not give an officer the required information to which he or she has a right.

Finally, an "address" is a "[p]lace where mail or other communications will reach [a] person" and is "[g]enerally a place of business or residence." Black's Law Dictionary 60 (4th ed. 1951). Like a name, the address must include enough information to allow an officer to verify if the person is who he or she says. If you can write the suspect's response on an envelope and it will make its way to the suspect's

---

[12]Speculating about a statute's legislative "purpose" is often hazardous, particularly when it would require divining the collective mental processes of 140 members of the Alabama Legislature. But no such speculation is necessary here. The statute's purpose is evident from its text. An "investigation" involves "examin[ing] and inquir[ing] into with care and accuracy." Black's Law Dictionary 960 (4th ed. 1951). By its very nature, asking a person for his or her name and address and an explanation of his or her conduct serves an investigatory function.

residence, then that is good enough. However, like the hypotheticals above, if a suspect were to give a vague response, such as his house is "across from the grocery store" or is "the blue one down the street," the response would not meet the demands of the statute. So, officers making a valid stop under § 15-5-30 have not only the right to <u>demand</u>, but also the right to <u>receive</u>, a full legal name and a mail-worthy address.

### ii. The Plain Language of § 15-5-30 Answers the Question Before Us

But what happens when the suspect gives an incomplete name or an imprecise address? What are the next steps that the officer can take? The question as certified to our Court asks whether, under those circumstances, the officer is "prohibited" from demanding, like the name and address, physical identification to confirm the information. The answer is no.

Jennings, in his brief, says that the statute, "by its plain text, does not permit law enforcement to demand physical identification." Jennings's brief at 14-15. He then proceeds to quote the statute without further analysis, other than to cite <u>Edger v. McCabe</u>, 84 F.4th 1230, 1238-39 (11th Cir. 2023),  in which the United States Court of Appeals for the Eleventh Circuit determined that § 15-5-30 was "so clear that no

25

reasonable officer could have interpreted it to permit [an] arrest for failing to produce [physical identification]."

I interpret Jennings's argument, much like the Eleventh Circuit Court of Appeals' decision, to be primarily based on the expressio unius canon of statutory interpretation, also known as the negative-implication canon. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts at 107 (Thomson/Reuters 2012). The Latin name from which the canon is derived means that the "expression of one thing implies the exclusion of others." Id. Stated simply, it appears to me that Jennings is arguing that because the statute expressly provides for a demand for three things -- a name, an address, and an explanation of actions -- an officer is permitted to demand nothing more. In other words, because physical identification is not on the list, an officer is prohibited from demanding it.

However, this canon only works to exclude other items in the same category. When the statute in this case limits the demands to name, address, and explanation of actions, it limits the officer to the types of information he or she can demand, not how he or she can demand them. So, an officer cannot demand the suspect's Social Security number or date

26

of birth, but that does not mean that he or she cannot demand the name and address in a verifiable form. As the main opinion makes clear, the statute limits the information an officer can demand, but not the ways he or she can demand it. Because this Court is the ultimate authority on the interpretation of Alabama law, its decisions define how Alabama law is applied and understood. See Blue Cross & Blue Shield of Alabama, Inc. v. Nielsen, 116 F.3d 1406, 1413 (11th Cir. 1997) ("The final arbiter of state law is the state supreme court, which is another way of saying that Alabama law is what the Alabama Supreme Court says it is.").

As stated above, officers have a right to the information that the statute lists when a suspect gives an incomplete or unsatisfactory oral response. That right authorizes them to demand physical identification of that information in at least these circumstances. It is of no matter to say, as Jennings does here, that the physical identification contains information that the suspect is not compelled to provide, like height, weight, and organ-donor status. That is true. But the physical identification contains the information that the suspect is compelled to provide in verifiable form and that is sufficient. It is the presence of the authorized information that makes the demand lawful. The presence of

27

other information does not then make the demand unlawful.

Authorization to demand physical identification is also a correct application of the predicate-act canon, which provides that, when a statute authorizes an agent to perform specified acts, it also authorizes the agent to employ reasonable and appropriate means necessary to carry those acts into execution. See Riley v. Cornerstone Cmty. Outreach, Inc., 57 So. 3d 704, 720 (Ala. 2010) ("'"When a [provision of law] gives a general power or enjoins a duty, it also gives by implication, every particular power necessary for the exercise of the one or the performance of the other."'" (citations omitted)). It is no defense that an officer might have pursued other methods of obtaining a suspect's full name. The existence of alternatives does not negate implied authority to use a reasonably adapted means of verification.[13] Nor does the law require a hierarchy of investigative baby steps, such as continued oral questioning,

---

[13]In fact, Jennings agreed at oral argument that "the statute is in place here to give law enforcement the tools in order to ascertain the information ...." See Supreme Court of Alabama, Supreme Court O/A Montgomery, Alabama, YouTube (January 7, 2026, 10:05-10:13) (emphasis added) (at the time this decision was issued, this oral-argument session could be located at: https://www.youtube.com/watch?v=-U3qeHk2rFk). On this point, Jennings is correct.

28

before requesting physical identification to confirm the information an officer is statutorily authorized to demand.

Yet another canon counsels in favor of this Court's interpretation: the presumption against change in the common law. See Scalia and Garner, supra, at 318-19. Under that canon, "[a] statute will be construed to alter the common law only when that disposition is clear." Id. at 318.

At common law, law-enforcement officers possessed limited authority to stop and question individuals reasonably suspected of criminal activity, which included an obligation on the part of the suspect to provide his or her name. As the Supreme Court has explained, this authority traces to early English law permitting officers to detain suspicious persons unless they gave "'a good Account of themselves.'" Hiibel, 542 U.S. at 183 (quoting 15 Geo. 2, ch. 5, § 2 (1744)). Alabama adopted this common-law framework.[14] Nothing cited by Jennings draws a distinction in that common-law tradition between oral identification

---

[14]See § 1-3-1, Ala. Code 1975, which reads:

"The common law of England, so far as it is not inconsistent with the Constitution, laws and institutions of this state, shall, together with such institutions and laws, be the rule of decisions, and shall continue in force, except as from time to time it may be altered or repealed by the Legislature."

and other ordinary means by which identity might be conveyed. Absent any indication that the Legislature intended a clear departure from this background rule, the common-law supplies no presumption against reading the statute to permit an officer to demand physical identification.

Jennings responds that traditional vagrancy and stop-and-identify laws -- like the statute at issue in <u>Kolender v. Lawson</u>, 461 U.S. 352, 358 (1983) -- raise constitutional vagueness concerns. He argues that applying a test based on whether a response was "incomplete or unsatisfactory" renders the statute void for vagueness. But <u>Kolender</u> involved a materially different statute and a materially different judicial construction. In that case, California courts construed their stop-and-identify law to require "credible and reliable" identification -- an interpretation that "contain[ed] no standard for determining what a suspect has to do" to comply and "vest[ed] virtually complete discretion in the hands of the police." <u>Id.</u> at 358.

We do not read § 15-5-30 so broadly. Our interpretation today permits an officer to demand only identification containing the specific information enumerated in the statute when the suspect provides an incomplete or objectively insufficient oral response. An answer is

"incomplete or unsatisfactory" not because an officer doubts its truthfulness or plausibility, but because it fails to supply the information the statute expressly requires or is nonresponsive to the inquiry posed. Thus understood, the statute does not turn on an officer's subjective assessment of "credibility" or "reliability," but on whether the required identifying information has been provided at all.[15]

This construction is consistent with the constitutional framework governing investigative stops under <u>Terry</u> that the main opinion explains in detail. Whether a <u>Terry</u> stop may continue once a suspect provides complete identifying information is a question addressed by <u>Hiibel</u>, and I see nothing in § 15-5-30 -- or in the main opinion's interpretation of it -- that extends beyond what <u>Hiibel</u> permits. Properly construed, the statute does not authorize enforcement based on whatever an officer might subjectively deem "credible and reliable," and it therefore does not suffer

---

[15]For that matter, Jennings again conceded at oral argument that it is "<u>not [his] position that they could have ran his name with [the] information he originally provided</u>." <u>See</u> Supreme Court of Alabama, <u>Supreme Court O/A Montgomery, Alabama</u>, YouTube (January 7, 2026, 9:16-9:20) (emphasis added) (at the time this decision was issued, this oral-argument session could be located at: https://www.youtube.com/watch?v=-U3qeHk2rFk). In any event, whatever the statute requires, Jennings knew what information he was obligated to provide.

31

from the vagueness defect identified in <u>Kolender</u>.

### iii. What We Do Not Decide

In the last paragraph, the main opinion states: "In summary, Alabama law is clear -- once an officer has reasonable suspicion to believe that a suspect is committing, has committed, or is about to commit a felony or other public offense, § 15-5-30 empowers the officer to <u>demand</u> that the suspect disclose his or her name and address <u>in a format that would allow the officer to affirmatively identify the suspect</u>." ____ So. 3d at ____ (emphasis added). I understand the phrase "in a format that would allow the officer to affirmatively identify the suspect" to mean that the officer need not accept "an incomplete or unsatisfactory oral response." Instead, under § 15-5-30, the officer may in that circumstance take all proper investigatory means, consistent with <u>Terry</u>, to obtain complete and satisfactory information allowing the officer to affirmatively identify the suspect, including demanding physical identification. <u>See also</u> <u>Hiibel</u>, 542 U.S. at 188-89 ("It is clear in this case that the request for identification was 'reasonably related in scope to the circumstances which justified' the stop." (quoting <u>Terry</u>, 392 U.S. at 20)). I do not read the main opinion as reaching the question of whether an

32

officer may "demand" physical identification after a suspect provides complete and satisfactory responses regarding the three requested pieces of information.

II. Conclusion

In sum, I agree with the main opinion that, when a suspect gives an incomplete or unsatisfactory oral response, an officer is not prohibited from requesting or demanding the suspect's name and address in the form of physical identification and, in fact, is authorized to do so.

SHAW, Justice (concurring in the result).

Section 15-5-30, Ala. Code 1975, provides that a law-enforcement officer "may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address and an explanation of his actions." This Code section does not provide that officers may randomly demand identification. It instead provides that certain officers, in certain places, in certain situations, may "demand" certain information.

It is beyond cavil that the word "name" refers to a person's actual name. Giving a false name, a nickname, or an occupational or professional title in place of all or part of a person's actual name is not answering with one's "name"; such answers do not respond to the "demand" of a person's "name" under § 15-5-30 and are nonresponsive.

The Code section allows an officer to demand an "address." The word "address" refers to a street name and number. A reference to a general geographical location where one lives is nonresponsive.

When a person refuses to answer following a demand under § 15-5-30 or when that person's answer is nonresponsive, the person has not responded to the demand.

The Code section does not specify the manner in which a person may respond to the demand. While, in context, an officer engaging a person in a public place would naturally imply an oral interaction, nothing in the Code section requires that an answer be in the form of an oral response. Indeed, a person might not be able to answer orally.

The Code section authorizes an officer to demand and obtain a person's actual name and address. It does not allow nonresponsive answers. The language in the Code section does not limit an officer to demanding only an oral answer.

MENDHEIM, Justice (dissenting).

I respectfully dissent. Regarding the answer to the certified question, I agree with the main opinion that Ala. Code 1975, § 15-5-30, does not prohibit a law-enforcement officer from demanding physical identification when a person whom the officer reasonably suspects is about to commit a felony or other public offense fails to provide an adequate name, address, or explanation of his or her actions for purposes of identification. Nevertheless, I dissented from the Court's decision to accept the question before us and believe we should decline to answer the question due to basic principles of comity with the federal courts.

Based on the materials before us, neither United States District Court Judge R. David Proctor nor any party sought to certify a question to this Court regarding the meaning or application of § 15-5-30 before the Eleventh Circuit Court of Appeals' decision reversing the merits-based judgment against Michael Jerome Jennings and in favor of the City of Childersburg and police officers Christopher Smith, Justin Gable, and Jeremy Brooks. See Jennings v. Smith, No. 23-14171, Sept. 27, 2024 (11th Cir. 2024) (not reported in Federal Reporter) ("Jennings II"). Instead, Judge Proctor initially addressed the meaning and application

36

of that statute, expressly after considering the "decision in <u>Edger v. McCabe</u>, 84 F.4th 1230 (11th Cir. 2023)," when entering the aforementioned judgment. <u>Jennings v. Smith</u>, No. 1:22-cv-01165-RDP, Dec. 21, 2023 (N.D. Ala. 2023) (not reported in Federal Supplement) ("<u>Jennings I</u>"). In <u>Jennings II</u>, the Eleventh Circuit Court of Appeals disagreed with the decision in <u>Jennings I</u>, specifically determining that "this case falls within the purview of <u>Edger</u>[ v. McCabe, 84 F.4th 1230 (11th Cir. 2023)]," as to the meaning and application of § 15-5-30. Thus, the Eleventh Circuit Court of Appeals has made its determination regarding Alabama law for purposes of this case, and this Court is now presented with a question that will require us to state or infer either that the Eleventh Circuit Court of Appeals erred in <u>Jennings II</u> because <u>Edger v. McCabe</u>, 84 F.4th 1230 (11th Cir. 2023), does not accurately reflect Alabama law; that that court erred in <u>Jennings II</u> because <u>Edger</u> was correctly decided but is distinguishable from or irrelevant to this case; or that that court correctly understood and applied Alabama law in <u>Jennings II</u>. In other words, this case is postured such that this Court essentially is reviewing the decision of the Eleventh Circuit Court of Appeals in <u>Jennings II</u> rather than entertaining a question from that

37

court regarding Alabama law for purposes of prospective application to the case. I do not believe that reflects a proper use of Rule 18, Ala. R. App. P.

As counsel for Smith, Gable, and Brooks acknowledged in their "Preliminary Brief in Support of Accepting the Certified Question" ("the brief in support") filed with this Court, on May 19, 2025, Judge Proctor entered "a memorandum opinion and order granting the motion of [Smith, Gable, and Brooks] and their employer, the City of Childersburg, to certify a question regarding Alabama Code § 15-5-30 to this Court." The brief in support, p.6. The May 2025 order, a copy of which was attached as Appendix B to the brief in support, states: "This matter is before the court on [Smith, Gable, and Brooks's] Motion to Certify Controlling Question to the Supreme Court of Alabama. … For the reasons discussed below, the Motion … is GRANTED."

The motion to certify referenced in the May 2025 order was filed in response to a March 4, 2025, order entered by Judge Proctor, a copy of which was attached as Appendix F to the brief in support. The March 2025 order was entered after a status conference. We have no transcript

38

of what was said at that conference, but Judge Proctor stated as follows

in footnote 1 of the March 2025 order:

> "At the status conference, the court candidly acknowledged that it is not at all convinced that the Eleventh Circuit correctly interpreted Alabama Code § 15-5-30. But, that is of no moment. It is simply irrelevant what the undersigned, sitting as a lower court, thinks. After all, unless there is a change in controlling law or a presentation of new facts to the trier of fact, the Eleventh Circuit's holding is law of the case here. <u>Piambino v. Bailey</u>, 757 F.2d 1112, 1120 (11th Cir. 1985)."

In the March 2025 order, Judge Proctor then questioned whether the

Eleventh Circuit Court of Appeals had properly relied on <u>Edger</u>, and he

proceeded to discuss exceptions to the law-of-the-case doctrine,

specifically noting that an exception to the application of the doctrine

existed "'"when there has been a change in controlling authority.'""

(Quoting <u>Newman v. Ormand</u>, 456 F. App'x 866, 867 (11th Cir. 2012),

quoting, in turn <u>Jackson v. Alabama State Tenure Comm'n</u>, 405 F.3d

1276, 1283 (11th Cir. 2005).) Judge Proctor then opined that the question

might be certified to this Court (which might generate a change in

controlling authority for purposes of establishing an exception to the law-

of-the-case doctrine), and he requested briefs on the issue whether to

certify a question to this Court and how that question should be framed.

In response to the March 2025 order, Smith, Gable, and Brooks filed a brief that included a motion for certification, which they attached as Appendix D to the brief in support. As noted above, Judge Proctor granted that motion.

I dissented from the Court's decision to accept Judge Proctor's request that we answer the certified question, and I still believe that we should decline to answer the question. In Palmore v. First Unum, 841 So. 2d 233 (Ala. 2002), this Court declined to answer a certified question, noting that principles of comity weigh in favor of declining to answer a question in circumstances similar to those before us:

> "As stated above, on June 29, 2001, the district court issued a memorandum opinion in this case in which it held, based upon its previous opinion in Gilbert v. Alta Health & Life Insurance Co., 122 F. Supp. 2d 1267 (N.D. Ala. 2000), that Alabama's tort of bad faith was not preempted by ERISA. The Eleventh Circuit reversed this holding in its Gilbert decision, which was released on December 27, 2001. On January 17, 2002, the district court certified its question to this Court, noting the reversal but stating that the Eleventh Circuit's mandate in Gilbert had not yet been released. We accepted the certified question on February 15, 2002. However, after refusing to hear the Gilbert case en banc, the Eleventh Circuit issued its mandate to the district court on March 22, 2002. The issuance of this mandate (which, of course, binds the district court) raises a serious question regarding the propriety of the outstanding certified question, which is an apparent challenge to the Eleventh Circuit. To say the least, these events place this Court in an unenviable position -- a position

40

that at least favors, if not demands, that we decline to answer the certified question."

841 So. 2d at 236 n.3; see also Gerber Prods. Co. v. Mitchell, Williams, Selig, Gates & Woodyard, PLLC, No. CV-22-326, Mar. 2, 2023 (Ark. 2023) (not published in South Western Reporter) (discussing a certified question from the United States District Court for the Eastern District of Arkansas, following remand, and stating: "This certified question comes before us in an unusual procedural posture. As stated above, the Eighth Circuit has directly addressed the issue involved in the certified question presented to this court. Therefore, exercising our broad discretion under Rule 6-8, [Ark. R. Sup. Ct.], we rescind our decision to answer the certified question.");[16] Broadview Sav. & Loan Co. v. Riestenberg, 49 Ohio St. 3d 133, 134, 550 N.E.2d 949, 949 (1990) (refusing to consider a certified question, following remand, and stating: "Since the Sixth Circuit Court of Appeals has given its answer, we believe it would be inappropriate to intervene between the federal appellate and

---

[16]Pursuant to Rule 5-2(c), Ark. R. Sup. Ct., "[e]very Supreme Court and Court of Appeals opinion issued after July 1, 2009, is precedent and may be relied upon and cited by any party in any proceeding." The Comments to Rule 5-2 state: "Subdivision (c) eliminates the distinction between unpublished opinions. All opinions issued after July 1, 2009, are precedent and may be cited in any filing or argument in any court."

district courts. This decision does not preclude the Sixth Circuit Court of Appeals from seeking our opinion should this case again reach it on appeal.").

Although I understand that the decision whether to certify a question generally is a discretionary one for the pertinent federal court, certification after the receipt of an adverse decision on the merits is not favored in the federal system, and the certification in the present case has come only after a significant expenditure of federal judicial resources in answering the question that has now been certified to this Court. See, e.g., Boyd Rosene & Assocs., Inc. v. Kansas Mun. Gas Agency, 178 F. 3d 1363, 1365 (10th Cir. 1999) (rejecting a request for certification that was made for the first time on rehearing, noting that the request was made only after an adverse decision on the merits, and stating that granting certification "at this late hour would be inefficient and wasteful of the parties' and the federal courts' previously expended time, energy, and resources"); see also City of Columbus v. Hotels.com, L.P., 693 F.3d 642, 654 (6th Cir. 2012) ("[C]ertification is disfavored where a plaintiff files in federal court and then, after an unfavorable judgment, 'seek [s] refuge' in a state forum. Local 219 Plumbing & Pipefitting Indus. Pension Fund v.

Buck Consultants, LLC, 311 Fed. Appx. 827, 831 (6th Cir.2009). "The appropriate time to seek certification of a state-law issue is before a District Court resolves the issue, not after receiving an unfavorable ruling.' Id. at 832."). And I am particularly troubled by that prospect when no judge on the Eleventh Circuit Court of Appeals' panel that decided Jennings II, which included the judge who authored Edger, Judge Charles R. Wilson, and who was on the panel for another case pertinent to Judge Proctor's decision to certify, namely Metz v. Bridges, No. 23-11275, Dec. 12, 2024 (11th Cir. 2024) (not reported in Federal Reporter), even suggested that certification might be appropriate. See Lehman Bros. v. Schein, 416 U.S. 386, 391-92 (1974) (noting that a dissenting judge on the Fifth Circuit Court of Appeals had urged that court to certify the state-law question at issue to the Florida Supreme Court and remanding the case to the Court of Appeals "so that that court may reconsider whether the controlling issue of Florida law should be certified to the Florida Supreme Court"); see also Hiji v. City of Garnett, 248 Kan. 1, 4, 804 P.2d 950, 952 (1991) (accepting a certified question and noting that the United States Court of Appeals for the Tenth Circuit had suggested that the federal district court, on remand, either certify

43

the state-law question to the Kansas Supreme Court or reexamine Kansas caselaw).

Stewart, C.J., and McCool, J., concur.